IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

03 OCT -1 PH 3:38

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| NORTH JACKSON PHARMACY, INC.; and C & C, INC., d/b/a BIG C DISCOUNT DRUGS, INC., individually and on behalf of all others similarly situated. | ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) ) **Civil Action No.** |
| EXPRESS SCRIPTS, INC. | ) ) |
| **Defendant.** | ) ) CV-03-B-2696-NE |

## COMPLAINT

COME NOW, Plaintiffs North Jackson Pharmacy, Inc., an independent pharmacy, and C & C, Inc., d/b/a Big C Discount Drugs, an independent pharmacy, seeking damages from and injunctive relief against Defendant Express Scripts, Inc., and allege, based upon their own knowledge with respect to the actions of Defendant, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.       This is a federal class action brought by North Jackson Pharmacy, Inc., and C & C, Inc. d/b/a Big C Discount Drugs, individually and on behalf of similarly situated independent pharmacies seeking redress for the illegal acts of Defendant. This class action seeks to recover actual and treble damages and costs, including attorneys fees, for Defendant's unlawful anticompetitive conduct, and to obtain equitable relief enjoining Defendant from engaging in unlawful anticompetitive acts in the future.

2.     There are approximately 25,000 independent community pharmacies in the United States, which dispense approximately 1.3 billion prescriptions annually amounting to $60 billion dollars in prescription sales.   These 25,000 independent pharmacies sell 44% of the retail prescription drugs in the United States.   Unlike large, chain drug stores, independent pharmacies derive almost all of their revenue from the sale of prescription drugs.  Almost 90% of all independent pharmacies' annual sales are from prescription drugs.   These entities are vital and indispensable members of the healthcare delivery system, who provide an invaluable service to the members of their communities.

3.     Pharmacy Benefit Managers ("PBMs") are entities that manage and administer prescription drug benefit programs for employers, unions, health plans and other payors (hereinafter "client payors").  PBMs were created to act as a broker between these payors and the drug companies to control the costs of prescription drugs and drug coverage for client entities.  As prescription drug costs have risen, and with the number of choices for drugs for a given treatment also increasing, client payors have turned increasingly to PBMs to manage the prescription drug process on their behalf.  Together the Defendants herein control the prescription drug benefits for approximately 210 million Americans; 70% of the U.S. population and approximately the same percentage of Alabamians.

4.     PBMs negotiate with drug manufacturers to determine the particular drugs that will be included in its formulary, and then contract with Plaintiff Pharmacies to fulfill the prescription drug needs of the PBMs' client payor beneficiaries.  Initially, PBMs were compensated by charging disclosed administrative fees in exchange for services.  PBMs now maximize their revenue thru

2

disclosed and undisclosed methods resulting in egregious injuries to Plaintiff Independent Pharmacies.

5.      PBMs engage in numerous anti-competitive practices that have a detrimental effect on the competition for the dispensing and sale of prescription drugs reimbursed by insurance and generally result in increased prescription drug costs to both consumers and pharmacies and lower reimbursement rates to the pharmacies.  These practices, engaged in by Defendant, and other PBMs, are described in detail below, but include among other practices:

        a.      Fixing and artificially depressing the prices to be paid to pharmacies for prescription drugs.

        b.      Accepting "kickbacks" such as rebates, discounts and other undisclosed incentives from drug manufacturers in return for placing the manufacturer's drugs on the PBM's formulary and "pushing" these drugs on physicians and pharmacists regardless of whether the drug is the least expensive and most therapeutically effective drug available.

        c.      Using their monopolistic market power to force unconscionable reimbursement rates on Plaintiff independent pharmacies.  These reimbursement rates are far below the rates that would apply in a true competitive market and are generally below the independent pharmacies costs.  Additionally, the Defendant and other PBMs, unilaterally change the reimbursement rates without consulting the member pharmacies and force this new rate upon them.

        c.      Diverting health plan members to mail order pharmacies, which are owned by the PBMs, by prohibiting retail pharmacies from providing more than a 30-day supply of drugs, while allowing their own mail order pharmacies to provide 90-day supplies.

3

d.      Removing the physician and pharmacist from their vital role in the health care equation.  PBMs "push" their formulary drugs on health plan members, by-passing the physician and the pharmacist, regardless of whether the formulary drug is the cheapest or most therapeutic drug in that class.

e.      Requiring pharmacists to contact the prescribing physician and patient, if a non-formulary drug was prescribed, and encourage a change to a formulary drug; and to provide the prescribing physician with a list of alternative formulary drugs.

f.      Requiring member pharmacies to use and pay for common software systems to process claims that are designed to maintain the detrimental pricing schemes.

g.      Imposing unreasonable and unnecessary additional costs on member pharmacies, including charging them a fee for each claim processed and a fee when the pharmacies seek information from a PBM.

## JURISDICTION AND VENUE

6.      This action is brought to recover damages caused by reason of, and for injunctive relief against, the violations of Defendant as alleged in detail below, of § 1 of the Sherman Act, 15 U.S.C. § 1.

7.      This Court has subject matter jurisdiction over these claims under 15 U.S.C. §§ 15 and 26, pursuant to 28 U.S.C. §§ 1331 and 1337.

8.      A substantial part of the events of omission giving rise to the claims in this action occurred in this judicial District, and Defendant transacts business within this District.  Therefore, venue is proper in the Northern District of Alabama under 28 U.S.C. §§ 1391 (b) and (c), and 15 U.S.C. §§ 15 and 22.

4

## PARTIES

### Plaintiff

9.      North Jackson Pharmacy, Inc. (hereinafter "North Jackson Pharmacy"), is a corporation incorporated under the laws of the State of Alabama with its primary place of business in Jackson County, Alabama.  North Jackson Pharmacy is an independent pharmacy whose primary business is the dispensing and sale of prescription drugs.  Brian Hicks is president of North Jackson Pharmacy.

10.      C & C, Inc., d/b/a Big C Discount Drugs (hereinafter "Big C Drugs"), is a corporation incorporated under the laws of the State of Alabama with its primary place of business in Jackson County, Alabama.  Big C Discount Drugs is an independent pharmacy whose primary business is the dispensing and sale of prescription drugs.  Dexter Cordes and Jeff Stewart are co-owners of Big C Discount Pharmacy.

11.      North Jackson Pharmacy and Big C Discount Drugs bring this lawsuit on behalf of themselves and all other similarly situated independent pharmacies and pharmacists who have contracted with the defendants to dispense and sell prescription drugs to members of the client payors' health plans.

### Defendants

12.      Various other individuals, partnerships, sole proprietorships, business entities, companies and corporations, some of whom are known to Plaintiffs and some of whom are presently unknown to Plaintiffs, and not named as Defendants in this Complaint, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in

furtherance thereof.  Such unknown persons or entities acted as co-conspirators and aided, abetted or

participated with Defendant in the commission of the wrongful acts alleged in this Complaint.

13.    The Defendant does business in the State of Alabama and has engaged in the

wrongful conduct alleged in this Complaint in the State of Alabama.

**Express Scripts**

14.    Express Scripts, Inc. ("Express Scripts") is a Delaware corporation with its

principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri.  Express

Scripts is the third largest PBM in North America.

15.    Express Scripts handles the prescription drug benefits for over 50 million people.  In

2002 Express Scripts acquired National Prescription Administrators, which was the largest privately

held, full-service PBM at that time.  Express Scripts processed over 96 million retail network claims

in the second quarter of 2003 and produced a revenue of $3.3 billion for that same quarter which is

up $100 million from the $3.2 billion in revenues for the first quarter of 2003.

FACTS

**A.    The PBM Market.**

16.    Pharmacy Benefit Managers or "PBMs" are companies that came into being in the

late 1980s.  The purpose of these companies was to decrease prescription drug costs to health

insurers, employers and consumers by using mass buying power to negotiate lower prescription

prices for prescription drugs with drug manufacturers.  Health insurers and employers contract with

PBMs in the hopes of decreasing their prescription drug costs.  After a health insurer or employer

contracts with a PBM, the health plan or employer's subscribers are required to go to participating

pharmacies and purchase preferred drugs.  This in turn gives the PBM the mass buying power

necessary to negotiate a discounted price with the drug manufacturers.

6

17.    Typically, after a health insurer hires a PBM to administer the pharmacy benefits under its health plan the PBM establishes a closed network of participating pharmacies ("member pharmacies") that agree to discount the prices.  These network pharmacies sometimes are required to agree not to join any other PBM network that competes with the PBM for that insurer's business. These pharmacies are induced to join this network by the expectation that they will receive a greater volume of business because the PBMs provide the plan subscribers with an incentive to patronize the network pharmacies by offering larger reimbursements for drugs purchased at those pharmacies than for drugs purchased at non-network pharmacies; because the PBM agrees to limit the number of pharmacies in its network; and because the pharmacies hope to access the PBMs dominant market share of the dispensing and sale of prescription drugs reimbursed by insurance.  The contracts between the PBMs and member pharmacies are not negotiated contracts between two parties of equal negotiating power, but contracts of adhesion, which are presented to the pharmacies on a "take-it-or-leave-it" basis.

18.    The PBMs negotiate their "discounted price" from drug manufacturers and set their reimbursement rates to the member pharmacies, based on "average wholesale prices" or AWPs or "maximum allowable costs" or MACs.  These are prices for drugs that are established by known and unknown sources and published in industry trade magazines and databases.

19.    The four largest PBMs[1] have an immense market share as they control the prescription drug benefits for approximately 210 million people in the United States.  Because the PBMs administer the prescription drug benefits for such a large percentage of the health plans, employers, and unions in the United States, they not only influence the choice of drugs health plan members will purchase but also the choice of pharmacies.

---

[1] With the Caremark purchase of AdvancePCS, the industry has become even more consolidated and this 210 million person market is now controlled by only three PBMs, Medco, Express Scripts and Caremark-AdvancePCS.

20.     Utilizing this immense market power, Defendant and the other PBMs, have exploited independent member pharmacies, by imposing predatory and punitively low reimbursement rates for the retail sale of prescription drugs that are reimbursed by insurance.  According to the Pharmacy Benefit Management Institute, the average dispensing fee that PBMs pay community retail pharmacies for dispensing a brand name drug was $2.21 in 2001, which is down from $2.50 in 1995.  Although, this is a decline of only 11.6%, when adjusted for inflation this rises to 24%.  For small independent community pharmacies like the Plaintiffs, the lowering of the reimbursement rate to this level effectively erases any profit margin, when one takes into account the cost of bottles, labels, and overhead.  Independent pharmacies are faced with an almost impossible choice; either accept the unconscionably low reimbursement rates set by the PBMs, gaining access to the huge prescription drug sales market they provide and hope to squeeze out a meager existence, or refuse their terms and go out of business.  The injuries and damages to Plaintiffs, as independent pharmacies, are especially pronounced because the independent pharmacies do not possess the market share to compete with the large chain pharmacies many of whom own their own PBM.  (The top 5 pharmacy chains, comprised of Walgreens, CVS, Rite Aid, Eckerd and American Drug Stores, own their own PBM).

21.     In addition to injuring independent pharmacies in the above manner, Defendant's illegal anti-competitive practices have injured employers, unions, health plans and their subscribers.  Such actions by Defendant are done without reasonable justification, and with the intent to injure and damage the independent pharmacy, with the result that they have in fact injured and damaged independent pharmacies and these Plaintiffs in particular.  Additionally, Defendant's anticompetitive conduct is done with the purpose and intent to expand and/or retain their stranglehold on the market of insurance reimbursed prescription drug sales.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are met. The class is defined as follows:

> All independent pharmacies within the boundaries of the United States who contracted with any of the named Defendants, at any time during the period commencing ten years before the filing of this Complaint through the present (the "Class Period"), to dispense and sell prescription drugs for any client payors.

### RULE 23(a)

### Numerosity

23.     This putative class includes thousands of pharmacies throughout the United States and is therefore so large to make joinder of all members impracticable within the meaning of Fed. R. Civ. P. 23(a)(1).

### Commonality

24.     Pursuant to Fed. R. Civ. P. 23(a)(2), there are questions of law or fact common to all class members, including, but not limited too, the following:

a.     Was there an agreement/contract between the Defendant and any one or more of the Plaintiffs, for Plaintiffs to provide the dispensing and sale of prescription drugs reimbursable by insurance to the Defendant?

b.     Whether Defendant's contracts with Plaintiffs amount to a vertical maximum price fixing agreement?

9

c.      Whether the amounts paid to independent pharmacies for the dispensing and sale of prescription drugs have been fixed, artificially maintained, and/or stabilized at levels below those that would prevail in a competitive market?

d.      Whether Defendant engaged in concerted action and/or a contract, combination, or conspiracy with others to restrain competition in the market for the dispensing and sale of brand name and generic prescription drugs by arbitrarily setting the amount that Plaintiffs can charge to Plan Members for dispensing and sale of prescription drugs?

e.      Whether Defendant engaged in concerted action and/or a contract, combination, or conspiracy with others to restrain competition in the market for the dispensing and sale of prescription drugs reimbursable by insurance by diverting Plan Members' business from Plaintiffs to Defendant's own mail order pharmacy?

f.      Whether Defendant's contracts with member pharmacies for access to the market for the dispensing and sale of  prescription drugs reimbursable by insurance was conditioned upon the Plaintiffs distributing the formulary drugs?

g.      Whether Defendant's alleged anticompetitive conduct caused injury or damage to Plaintiffs?

**Typicality**

25.     The claims of the named Plaintiffs are typical of the claims of the defined class, within the meaning of Fed. R. Civ. P. 23(a)(3), and are based on and arise out of the same anticompetitive, unlawful and confiscatory practices of the Defendant. Additionally, the Defendant and other PBMs all act in the same way toward the Plaintiffs.

10

26.     The proposed class representatives state claims for which relief can be granted that are typical of the claims of absent class members.  If litigated individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

### Adequacy

27.     The named Plaintiffs are committed to pursuing this action and are prepared to serve the proposed class in a representative capacity with all of the obligations and duties material thereto. The Plaintiffs will fairly and adequately represent the interests of the members of the class within the meaning of Fed. R. Civ. P. 23(a)(4) and have no interests adverse to, or which directly and irrevocably conflict with, the interests of the other class members.

28.     The named Plaintiffs have retained competent counsel experienced in class action litigation.  Said counsel will adequately prosecute this action, and will assert, protect and otherwise well represent the named class representatives and absent class members.

### RULE 23(b)(1)(A) AND (B)

29.     The prosecution of separate actions by individual class members would create a risk of adjudication with respect to individual class members which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to this action, or could substantially impair or impede their ability to protect their interests.

30.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent of varying adjudications with respect to individual members of the class which would establish incompatible rights within the plaintiff class.

### RULE 23(b)(2)

31.     The Defendant's actions are generally applicable to the class as a whole, and Plaintiffs seek equitable remedies with respect to the class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

### RULE 23(b)(3)

32.     The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Fed. R. Civ. P. 23(b)(3).  Common or general proof will be used by each class member to establish each element of their antitrust claims.  Additionally, proceeding as a class action is superior to other available methods of adjudication.  The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation since the cost of litigation far exceeds what any one class member has at stake.

### ANTITRUST ALLEGATIONS

33.     The Defendant has committed, and conspired to commit, with third parties, numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*  Defendant has combined, conspired and/or agreed with other parties to unreasonably restrain trade in violation of Section 1 of the Sherman Act by engaging in unlawful tying arrangements and numerous price fixing schemes.

### CONCERTED ACTION

34.     Defendant has engaged in concerted action with a number of non-parties, specifically other PBMs, in an effort to maintain their monopoly over the third-party reimbursed retail sale of prescription drug market.  The above concerted action between Defendant, other PBMs, and other unnamed parties, has resulted in unlawful and anticompetitive price fixing agreements and tying arrangements which unreasonably restrain trade.

12

35.     Defendant has also engaged in concerted action with the other PBMs and by acting in concert they are able to control the third-party reimbursed retail sales of prescription drugs market through numerous "price fixing" schemes and "tying arrangements." To accomplish this, the PBMs engage in parallel behavior. All have substantially similar contracts in which all material provisions are the same; all use the AWP and MAC to set their reimbursement prices to pharmacies; all require member pharmacies to use and purchase similar software designed to process claims and to maintain their detrimental pricing scheme; all impose unreasonable and unnecessary additional costs on member pharmacies; all continue to "push" drugs, by placing them on their formulary, that are not the least expensive or even the most therapeutic or effective of a given class of drugs; all contractually require pharmacies to turn over confidential customer data and then use that data to divert customers to their mail-order pharmacies; all refuse to disclose to pharmacies what price they have negotiated for formulary drugs with the drug manufacturer, including any rebates, discounts, or incentives they received; all refuse to share any of the savings they receive via these rebates and discounts with either the pharmacies or the health plan members; and all impose unconscionable and punitively low reimbursement rates on member pharmacies. It is through this concerted action that the Defendant and other PBMs maintain their oligopoly over the market for the dispensing and sale of prescription drugs reimbursed by insurance.

36.     Even under extreme social and political pressure to change their business practices, the PBM industry continues its illicit and anticompetitive behavior. Despite a number of lawsuits, federal investigations, and a recently filed federal "whistleblower" suit, the PBMs refuse to change the way they do business.

37.     Additionally, the PBM industry has their own trade and lobbying groups such as the

Pharmacy Care Management Association, which answers directly to the PBMs and lobbies Congress and State legislatures on behalf of the PBM industry. This trade/lobbying group has been integral in helping strike down both federal and state laws which would loosen the PBMs' oligopoly on the prescription drug benefit market.

## INTERSTATE COMMERCE

38.     The providing and sale of pharmaceutical products, and insurance coverage for such products, are each in, and affect, interstate commerce.

39.     The activities of the Defendant in administering and processing the prescription drug benefits for employers, unions, health plans in every state are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

## RELEVANT MARKETS

40.     The relevant product and/or service market affected by Defendant's conduct is the dispensing and retail sale of prescription drugs that are reimbursed by insurance.

41.     The relevant geographic market for the purposes of this action is United States.

## COUNT I
## SECTION ONE OF THE SHERMAN ACT

42.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

43.     Defendant has conspired and/or agreed with other parties, to unreasonably restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

44.     The Defendant has unreasonably restrained trade by engaging in numerous "price fixing" schemes. Defendant contracts with "member pharmacies" to allow them access to the market of retail sales of prescription pharmaceuticals that are reimbursed by insurance. This contract amounts to a vertical maximum price fixing agreement which seeks to artificially raise, fix or

maintain: (i) the price of prescription pharmaceuticals that the "member pharmacies" are allowed to charge; and (ii) the rates at which PBMs reimburse member independent pharmacies. This price is "fixed" so as to maximize the "spread" for the Defendant in an attempt to increase profits.

45.     The above agreement operates at the expense of independent pharmacies and unreasonably and illegally restrains trade. The above agreement illegally restrains competition in a number of ways, including:

a.  Setting reimbursement rates for Plaintiffs at unconscionable and punitively low levels which are far below the level that would exist in a true competitive market;

b.  Imposing unreasonable and unnecessary additional costs on Plaintiffs such as charging them a fee for every claim processed and a fee each time they seek information from Defendant.

c.  Unfairly diverting Plaintiffs' customers to mail order pharmacies owned by Defendant by using confidential customer information that the Plaintiffs are contractually required to submit to Defendant.

d.  Preventing Plaintiffs from competing with Defendant's mail-order pharmacy on equal footing by: (i) forcing member pharmacies to charge higher co-pays to retail customers, while charging mail-order customers a lower co-pay; and (ii) preventing Plaintiffs from dispensing and selling more than a 30-day supply of prescription drugs, while Defendant's mail-order pharmacy can dispense and sell 90-day supplies.

46.     Additionally, the above "price fixing" schemes have squeezed the Plaintiffs' profit margins below competitive levels. Normally, this would result in the member pharmacy being driven into the arms of a competing PBM. However, because of the overwhelming market power

that individual PBMs maintain in the relevant geographic market that each independent member pharmacy operates in, and because of the conspiracy and/or agreement among the PBMs themselves, there is no alternative supplier.  Because of the conspiracy among the PBMs and/or with other parties, the PBMs maintain their oligopoly and can "squeeze" Plaintiffs' margins to unconscionably low levels.

47.    All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injuries to the Plaintiffs.

48.    The Plaintiffs are entitled to damages under 15 U.S.C. § 15, *et seq.*

49.    As a result of the illegal agreements and/or conspiracies, Defendant has caused Plaintiffs to suffer financial loss in that Defendant, with its monopolistic market strength: (i) forces independent pharmacies to accept reimbursement rates that are set at unconscionably low levels; (ii) places on its formulary those drugs which affords its the highest "spread" and therefore the greatest profit; (iii) receives kickbacks and rebates from drug manufacturers in exchange for "pushing" their drugs on consumers which is done by placing a manufacturers' drugs on the PBMs' formulary regardless of whether that drug is the cheapest or most effective drug in its particular group; (iv) refuses to give pharmacies access to the market of the retail sale of prescription drugs that are reimbursable by insurance except on terms and reimbursement prices that leave no economic margin for the pharmacies' survival; (v) steers health plan members to mail order pharmacies, which are owned by the PBMs, by prohibiting retail pharmacies from providing more than a 30-day supply of drugs, while allowing the PBMs own mail order pharmacies to provide 90-day supplies; (vi) have taken pharmacists and physicians out of the medical care equation by either limiting, or altogether removing, their discretion to determine the fitness of a prescription drug; (vii) imposes unreasonable

and unnecessary additional costs on Plaintiffs, such as forcing them to purchase the software to process claims; charging them for every claim processed; and charging them each time they request information from the PBM such as information about changes in formulary drugs; and (viii) unilaterally imposes contract changes on Plaintiffs, including changes in reimbursement rates.

50. As a consequence of Defendant's illegal agreements and/or conspiracies, Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of their business. Plaintiffs are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees. Plaintiffs further seek injunctive relief in the form of order prohibiting Defendant from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

### COUNT II
### SECTION ONE OF THE SHERMAN ACT

51. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

52. Defendant has combined, conspired and/or agreed with other PBMs, to unreasonably restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1. Defendant combined, conspired and/or agreed with other PBMs to engage in a horizontal price fixing scheme that seeks to artificially raise, fix or maintain the price that Plaintiffs may charge for the dispensing and sale of prescription drugs that are reimbursed by insurance and to artificially raise, fix or maintain the price at which they will reimburse Plaintiffs for the dispensing and sale of these prescription drugs.

53. The above agreement and/or conspiracy is a *per se* violation of Section 1 of the Sherman Act, which operates at the expense of independent pharmacies resulting in a lower prices and lower reimbursement rates for prescription pharmaceutical products. The above agreement and/or conspiracy illegally restrains competition in a number of ways, including:

17

a.  Setting reimbursement rates for Plaintiffs at unconscionable and punitively low levels which are far below the level that would exist in a true competitive market;

b.  Imposing additional unreasonable and unnecessary costs on Plaintiffs such as charging them a fee for every claim processed and a fee each time they seek information from Defendant.

c.  Unfairly diverting Plaintiffs' customers to mail order pharmacies owned by Defendant by using confidential customer information that the Plaintiffs are contractually required to submit to Defendant.

d.  Preventing Plaintiffs from competing with Defendant's mail-order pharmacy on equal footing by: (i) forcing member pharmacies to charge higher co-pays to retail customers, while charging mail-order customers a lower co-pay; and (ii) preventing Plaintiffs from dispensing and selling more than a 30-day supply of prescription drugs, while Defendant's mail-order pharmacy can dispense and sell 90-day supplies.

54.     The above "price fixing" scheme has squeezed the Plaintiffs' profit margins below competitive levels.  Normally, this would result in the independent pharmacy being driven into the arms of a competing PBM.  However, because of the overwhelming market power that individual PBMs maintain in the relevant geographic market that each independent member pharmacy operates in, and because of the conspiracy and/or agreement among the PBMs themselves, there is no alternative supplier.  Because of the conspiracy among the PBMs and/or with other parties, the PBMs maintain their oligopoly and can "squeeze" Plaintiffs' margins to unconscionably low levels.

55.     All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injuries to the Plaintiffs.

18

56.    The Plaintiffs are entitled to damages under 15 U.S.C. § 15, *et seq.*

57.    As a result of the illegal agreements and/or conspiracies, Defendant has caused the Plaintiffs to suffer financial loss in that Defendant, with its monopolistic market strength: (i) force independent pharmacies to accept reimbursement rates that are set at unconscionably low levels; (ii) places on its formulary those drugs which affords it the highest "spread" and therefore the greatest profit; (iii) receives kickbacks and rebates from drug manufacturers in exchange for "pushing" their drugs on consumers which is done by placing a manufacturer's drugs on the PBMs' formulary regardless of whether that drug is the cheapest or most effective drug in its particular group; (iv) refuses to give pharmacies access to the market of the retail sale of prescription drugs that are reimbursable by insurance except on terms and reimbursement prices that leave no economic margin for the pharmacies' survival; (v) steers health plan members to mail order pharmacies, which are owned by the PBMs, by prohibiting retail pharmacies from providing more than a 30-day supply of drugs, while allowing the PBMs own mail order pharmacies to provide 90-day supplies; (vi) has taken pharmacists and physicians out of the medical care equation by either limiting, or altogether removing, their discretion to determine the fitness of a prescription drug; (vii) imposes unreasonable and unnecessary additional costs on Plaintiffs, such as forcing them to purchase the software to process claims; charging them for every claim processed; and charging them each time they request information from the PBM such as information about changes in formulary drugs;  and (viii) unilaterally imposes contract changes on Plaintiffs, including changes in reimbursement rates.

58.    As a consequence of Defendant's illegal agreements and/or conspiracies, Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of his business.  Plaintiffs are entitled to recover such actual damages as the

jury may find, threefold, plus costs, expenses and attorneys fees.  Plaintiffs further seek injunctive relief in the form of order prohibiting Defendant from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

## COUNT III
## SECTION ONE OF THE SHERMAN ACT

59.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

60.     Defendant has conspired and/or agreed with other parties, to unreasonably restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

61.     The Defendant has unreasonably restrained trade by engaging in illegal "tying arrangements."  As a condition of contracting or purchasing a PBMs services, participating pharmacies are also essentially required by these PBMs to also purchase those drugs that are listed on the PBM's formulary.   The Defendant "pushes" certain drugs, thereby making any contract with it conditional upon the member pharmacy buying and then selling the formulary drugs.

62.     The Defendant's tying arrangements unreasonably restrains trade by permitting it and the other PBMs to exploit their dominant market position in providing pharmacies access to the retail sales of prescription drugs that are reimbursable by insurance by diminishing competition on the merits in the market for the formulary drugs, which are given a much larger market share than they would normally have in a free enterprise situation.   This arrangement insulates inferior pharmaceutical products (drugs that are more expensive, less effective) from true free market competition.   A GAO study of Medco Health found that the number of Merck drugs (Medco Health's parent company at the time) on its formulary increased substantially, from one to eight, after Merck's purchase of Medco.   Thus, the GAO concluded, four of the eight drugs faced less competition because non-Merck drugs were dropped from Medco's formulary.

20

64.     All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injuries to the Plaintiffs.

65.     The Plaintiffs are entitled to damages under 15 U.S.C. § 15, *et seq.*

66.     As a result of the illegal agreements and/or conspiracies, Defendant has caused the Plaintiffs to suffer financial loss in that Defendant, with its monopolistic market strength: (i) forces independent pharmacies to accept reimbursement rates that are set at unconscionably low levels; (ii) places on its formulary those drugs which affords it the highest "spread" and therefore the greatest profit; (iii) receives kickbacks and rebates from drug manufacturers in exchange for "pushing" their drugs on consumers which is done by placing a manufacturer's drugs on the PBMs' formulary regardless of whether that drug is the cheapest or most effective drug in its particular group; (iv) refuses to give pharmacies access to the market of the retail sale of prescription drugs that are reimbursable by insurance except on terms and reimbursement prices that leave no economic margin for the pharmacies' survival; (v) steers health plan members to mail order pharmacies, which are owned by the PBMs, by prohibiting retail pharmacies from providing more than a 30-day supply of drugs, while allowing the PBMs own mail order pharmacies to provide 90-day supplies; (vi) has taken pharmacists and physicians out of the medical care equation by either limiting, or altogether removing, their discretion to determine the fitness of a prescription drug; (vii) imposes unreasonable and unnecessary additional costs on Plaintiffs, such as forcing them to purchase the software to process claims; charging them for every claim processed; and charging them each time they request information from the PBM such as information about changes in formulary drugs;  and (viii) unilaterally imposes contract changes on Plaintiffs, including changes in reimbursement rates.

67.     As a consequence of Defendant's illegal agreements and/or conspiracies, Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of their business.  Plaintiffs are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees.  Plaintiffs further seek injunctive relief in the form of order prohibiting Defendant from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for relief as follows:

a. that the jury find and this Court adjudge and decree that Defendant has engaged in the violations of law alleged herein above;

b. that Plaintiffs recover such actual damages as the jury shall find Plaintiffs to have sustained, together with such treble damages as the law shall permit or the jury shall find;

c.  that the Court issue an injunction enjoining and prohibiting Defendant from engaging in the violations of law set forth herein above;

d.  that the Court order expedited discovery on the issues presented by Plaintiffs' claims for injunctive relief due to the immediate harm being done to Plaintiffs by Defendant's violations of law set forth herein above;

e. that Plaintiffs recover the costs of suit herein, including reasonable attorneys fees as provided by sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; and

f.  that Plaintiffs have such other and further relief as this honorable Court shall deem just and appropriate.

## JURY DEMAND

The Plaintiffs demand a jury trial of all issues so triable.

Respectfully submitted,

Archie C. Lamb, Jr. (ASB-1488-A52A)
A. David Fawal (ASB-4593-W82A)
Chris W. Cantrell
Attorneys for Plaintiff

**OF COUNSEL:**
*THE LAW OFFICES OF ARCHIE LAMB, LLC*
2017 Second Avenue North, Suite 200
P.O. Box 2088 (35201)
Birmingham, Alabama 35203
Telephone: (205) 324-4644

Joe R. Whatley, Jr. (ASB-1222-Y96J)
Othni Lathram (ASB-3523-H71L)
Attorneys for Plaintiff

**OF COUNSEL:**
*WHATLEY DRAKE, LLC*
2323 Second Avenue North
P.O. Box 10647 (35202)
Birmingham, AL  35203-4601
Telephone: (205) 328-9576

23