FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 OCT 13  AM 9: 08

U.S. DISTRICT COURT
N.D. OF ALABAMA

NORTH JACKSON PHARMACY, Inc.,
C & C, Inc., d/b/a BIG C DISCOUNT DRUGS,
Inc., individually and on behalf of all others
similarly situated,
        Plaintiffs,

CIVIL ACTION NO. CV-03-HS-2696-NE
consolidated with: CV-03-HS-2697-NE

v.

EXPRESS SCRIPTS, Inc.,
        Defendant.
_____/

DR

**ENTERED**

**OCT 1 3 2004**

NORTH JACKSON PHARMACY, Inc.,
C & C, Inc., d/b/a BIG C DISCOUNT DRUGS,
Inc., individually and on behalf of all others
similarly situated,
        Plaintiffs,

CIVIL ACTION NO. CV-03-HS-2697-NE
consolidated with: CV-03-HS-2696-NE

v.

MEDCO HEALTH SOLUTIONS, INC.;
MERCK & CO., Inc.; and PAID
PRESCRIPTIONS, L.L.C.;
        Defendants.
_____/

## OPINION REGARDING MOTION TO
## DISMISS SECOND AMENDED COMPLAINT

This matter is before the court on a motion by the Defendants in these consolidated actions
to dismiss the Plaintiffs' Second Amended Complaint ("SAC"). Doc. 27. The Plaintiffs allege a
violation of § 1 of the Sherman Act. The issue is whether the SAC "state[s] a claim upon which

1



relief can be granted." F.R.Civ.P. 12(b)(6).  The court holds that it does.

## I. BACKGROUND

The Plaintiffs are independent pharmacies.  One of the four Defendants, Merck & Co., Inc., is a pharmaceuticals manufacturer.  The Plaintiffs allege that during the relevant time period, Merck "controlled and dominated" another Defendant, Medco Health Solutions, Inc., "to the extent that Medco was the mere 'alter ego' and/or agent of Merck."  SAC Doc. 90 (case no. CV-03-HS-2695-NE[1]) at ¶ 21.  Medco, like the other two Defendants, is a pharmacy benefits manager, or "PBM."  The PBMs administer drug-benefit plans on behalf of the plan sponsors.

## II. DISCUSSION

### A. Standard of Review

A complaint is not to be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Inquiry under Rule 12(b)(6) is limited to whether the complaint "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Id. at 47.  This liberal "notice pleading" standard applies in antitrust cases.  See Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746-47 (1976); cf. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002); Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69 (1993).

### B. Analysis

Section 1 of the Sherman Act states that "[e]very contract, combination . . . , or conspiracy,

---

[1]This is the original lead case.  It was transferred to the Northern District of Illinois on August 3, 2004.  Doc. 100 (case no. CV-03-HS-2695-NE).

in restraint of trade or commerce among the several States . . . is . . . illegal." 15 U.S.C. § 1. Though the statute does not explicitly so state, its scope is limited to "unreasonable" trade restraints. <u>See</u>, <u>e.g.</u>, <u>Maris Distr. Co. v. Anheuser-Busch, Inc.</u>, 302 F.3d 1207, 1215 (11th Cir. 2002).

The party alleging a § 1 violation must prove that two or more persons entered into an agreement to restrain trade. <u>Aquatherm Indus. v. Florida Power & Light Co.</u>, 145 F.3d 1258, 1262 (11th Cir 1998). The antitrust plaintiff must also prove that the restraint is unreasonable. <u>Retina Assocs. v. Southern Baptist Hospital of Fla.</u>, 105 F.3d 1376, 1380 (11th Cir. 1997) (<i>per curiam</i>).

Unreasonableness can be shown by demonstrating that the conduct in question is "historically . . . of the type that regularly poses anticompetitive consequences," and thus qualifies as a "<i>per se</i>" violation. <u>Id</u>. at 1381. In lieu of this, the plaintiff can establish a <i>per se</i> violation by means of "a preliminary examination of market conditions" which discloses an "anticompetitive effect," with no "procompetitive justification." <u>Id</u>.

Failing either of these alternatives, the antitrust plaintiff must cope with the "rule of reason," which requires proof that the defendant's "conduct had an anticompetitive effect in the relevant market; and . . . that no procompetitive rationale would justify the conduct." <u>Id</u>. at 1383. This approach requires more extensive evidence of an anti-competitive effect than is necessary in connection with a preliminary examination. <u>See id</u>. (The "preliminary examination of market conditions . . . is not as detailed as the one required by the rule of reason, and has been referred to as a 'quick look' at market conditions." (citation omitted)).

The SAC alleges that the Defendants have agreed amongst themselves, with other PBMs, and/or with plan sponsors to fix prices that would be paid to Plaintiffs for their services. SAC at ¶¶ 66-68, 74-77. The Plaintiffs characterize this as a "horizontal" scheme. <u>Id</u>. at ¶ 59. <u>See generally</u>,

3

e.g., Southern Card & Novelty v. Lawson Mardon Label, Inc., 138 F.3d 869, 875 n.9 (11th Cir. 1998) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." (citation omitted)).  They also assert that the price-fixing constitutes a *per se* violation of § 1.  See SAC at ¶¶ 67, 76; see generally, e.g., United States v. Giordano, 261 F.3d 1134, 1142 (11th Cir. 2001) (referring to the "long-established rule that a horizontal price-fixing agreement . . . is *per se* illegal").

In their motion to dismiss, the Defendants implicitly concede that a price-fixing conspiracy among PBMs would constitute a *per se* violation of § 1.  The Defendants do, however, claim that a conspiracy involving plan sponsors would create a "vertical" restraint, rather than a "horizontal" one, and therefore is not a *per se* violation.  They assert that the allegations of price-fixing are deficient in a number of other respects as well.  These assertions are considered in the sub-sections which follow.

*Conspiracy*

*(1) Plus Factors*

To establish their claim, the Plaintiffs will have to prove that the Defendants reached an agreement among themselves or with others on the price to be paid for Plaintiffs' services. Recognizing the unlikelihood that direct evidence of a price-fixing agreement will be available, courts permit the existence of such an agreement to be inferred from indirect evidence.  See, e.g., Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1299-1300 (11th Cir. 2003).

Indirect evidence often involves proof that the antitrust defendants demand similar contractual terms in dealing with the plaintiffs.  This "parallel" behavior is not enough by itself,

4

however, as it is just as plausible that the behavior simply reflects "a rational, independent calculus by each" of the defendants, rather than a conspiracy to fix prices. Id. at 1299. The courts have accordingly "fashioned a test under which price fixing plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy rather than of conscious parallelism." Id. at 1301. "One prominent 'plus factor' . . . is a showing that the defendants' behavior would not be reasonable or explicable (i.e., not in their legitimate economic self-interest) if they were not conspiring to fix prices . . . ." City of Tuscaloosa v. Harcros Chemicals, 158 F.3d 548, 572 (11th Cir. 1998).

The Plaintiffs accuse the Defendants of "parallel behavior." SAC at ¶ 53. They describe this behavior as follows:

> [The Defendants all] have substantially similar contracts in which all material provisions are the same; all are engaged in the formation of third-party utilization services, including Hub RX [sic – RxHub]; all used the AWP [average wholesale price] and MAC [maximum allowable cost] to set their reimbursement prices to pharmacies; all require member pharmacies to use and purchase similar software designed to process claims and to maintain their detrimental pricing scheme; all impose unreasonable and unnecessary additional costs on member pharmacies; all continue to "push" drugs, by placing them on their formulary, that are not the least expensive or even the most therapeutic or effective of a given class of drugs; all contractually require pharmacies to turn over confidential customer data and then use that data to divert customers to their mail-order pharmacies; all refuse to disclose to pharmacies what price they have negotiated for formulary drugs with the drug manufacturer, including any rebates, discounts, or incentives they received; all refuse to share any of the savings they receive via these rebates and discounts with either the pharmacies or the health plan members; and all impose the same or similar unconscionable and punitively low reimbursement rates on member pharmacies.

5

Id.[2]

The Defendants argue that "each of the parallel practices alleged . . . is . . . in the economic interest of individual PBMs acting independently and therefore cannot support an inference of conspiracy." Defendants' Brief (doc. 28) at 17. Because the SAC "proffers no plus factors reflecting unlawful parallel conduct," the Defendants assert, the complaint must be dismissed. Id.

The premise underlying this argument is that a complaint which fails to allege a valid plus factor is subject to dismissal pursuant to Rule 12(b)(6). The Defendants imply that such is the case, citing 3 cases for the proposition that "'plus factors' must be alleged." Id. at 16. Those cases are not on point, however, as they addressed the sufficiency of the plaintiff's evidence, rather than the adequacy of the complaint. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764-65 (1984); Williamson Oil, 346 F.3d at 1300-01; Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456 (11th Cir. 1991).

A case which the court believes *is* on point is the decision of the United States Supreme Court in Swierkiewicz, supra. There the plaintiff alleged that his employer discriminated against him on the basis of age and national origin. The Second Circuit affirmed dismissal of the complaint because the plaintiff did not allege "circumstances that support an inference of discrimination." Swierkiewicz, 534 U.S. at 510.

The Court reversed, stressing that under "the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of

---

[2]The Plaintiffs describe AWPs and MACs as "prices for drugs that are established by known and unknown sources" which are "published in industry trade magazines and databases." SAC at ¶ 31. RxHub is described by the Defendants as "an electronic link that permits healthcare providers, pharmacies and PBMs to share medical information and specific identification of prescription drugs for individual patients." Defendants' Brief (doc. 28) at 3.

6

facts that could be proved consistent with the allegations.'" Id. at 514 (citation omitted).  This "simplified notice pleading standard," the Court explained, "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. at 512.

The defendant in Swierkiewicz argued "that allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits." Id. at 514.  The Court was unswayed:

> Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits.  A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation. . . . Furthermore, . . . [F.R.Civ.P.] 8(a)[, which calls for "a short and plain statement of the claim showing that the pleader is entitled to relief,"] establishes a pleading standard without regard to whether a claim will succeed on the merits.  Indeed, it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

Id. at 514-15 (quotation marks & citations omitted).

The Court made clear in Swierkiewicz that for purposes of Rule 12(b)(6), so-called "conclusory" allegations are not inherently objectionable. See, e.g., Walker v. Thompson, 288 F.3d 1005, 1008 (7th Cir. 2002) ("Cases . . . which say that 'conclusory allegations' of conspiracy . . . are not enough to withstand a motion to dismiss cannot be squared with . . . *Swierkiewicz* . . . ."). Factual allegations in a complaint – even if "conclusory" – are sufficient if they allow the defendant to understand the gist of the plaintiff's claim, thereby making it possible to formulate a meaningful response:

> All that need be specified is the bare minimum facts necessary to put

> the defendant on notice of the claim so that he can file an answer.
> . . . All that's required to state a claim in a complaint filed in a
> federal court is a short statement, in plain (that is, ordinary, non-
> legalistic) English, of the legal claim . . . . The courts keep reminding
> plaintiffs that they don't have to file long complaints, don't have to
> plead facts, don't have to plead legal theories. . . . Had Higgs
> merely alleged that the defendants had retaliated against him for filing
> a suit, without identifying the suit or the act or acts claimed to have
> constituted retaliation, the complaint would be insufficient . . .
> because the defendant would not have known how to respond. But
> Higgs specified both the suit and the act of retaliation . . . , and this
> specification was enough to enable the defendants to file an answer.

Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002) (citation & quotation marks omitted). See also

Swierkiewicz, 534 U.S. at 512 (The function of the complaint is "simply [to] 'give the defendant fair

notice of what the plaintiff's claim is and the grounds upon which it rests.'" (quoting Conley, 355

U.S. at 47)); In re Initial Public Offering Securities Litigation, 241 F.Supp.2d 281, 324 n.42 &

accompanying text (S.D. N.Y. 2003).

As discussed, "plus factor" allegations serve to substantiate a plaintiff's conspiracy

allegation; their purpose is not to clarify an otherwise incomprehensible claim. Just as an

employment-discrimination plaintiff need not allege "circumstances that support an inference of

discrimination," Swierkiewicz, 534 U.S. at 510, there is no need for an antitrust plaintiff to allege

a "plus factor [which] generates an inference of illegal price fixing." Williamson Oil, 346 F.3d at

1301. Cf. Swierkiewicz, 534 U.S. at 510-11 ("The prima facie case [applicable to a claim of

employment discrimination]. . . is an evidentiary standard, not a pleading requirement. . . . [T]his

Court has reiterated that the prima facie case relates to the employee's burden of presenting evidence

that raises an inference of discrimination. . . . This Court has never indicated that the requirements

for establishing a prima facie case . . . also apply to the pleading standard that plaintiffs must satisfy

in order to survive a motion to dismiss."). But see Twombly v. Bell Atlantic Corp., 313 F.Supp.2d 174, 180-82 (S.D. N.Y. 2003) (declining to adhere to Swierkiewicz in the antitrust context, for reasons this court regards as unpersuasive). The Defendants' assertion that the SAC does not allege valid "plus factors" is therefore irrelevant under Rule 12(b)(6).

*(2) Specificity*

The Plaintiffs allege that the Defendants have "conspired . . . to fix reimbursement disbursement rates" paid to independent pharmacies. SAC at ¶ 46. The Defendants complain that more specific allegations are required, such as "when and how" price-fixing agreements were made, the "terms of such alleged agreements, and how those alleged agreements were supposedly implemented." Defendants' Brief at 12.

In support of their position, the Defendants cite 3 decisions of the Eleventh Circuit Court of Appeals – Aquatherm, supra, Lombard's v. Prince Mfg., 753 F.2d 974 (11ᵗʰ Cir. 1985), and Fullman v. Graddick, 739 F.2d 553 (11ᵗʰ Cir. 1984). See Defendants' Brief at 11.

The last-cited of these cases stated that "under the so-called notice rules of pleading," a complaint must include "sufficient detail . . . so that the defendant . . . can obtain a fair idea of what the plaintiff is complaining." Fullman, 739 F.2d at 556 (citation omitted). The Plaintiffs' contention that the Defendants have  conspired to fix the price to be paid for the services of independent pharmacies gives the Defendants a "fair idea" as to the nature of the Plaintiffs' grievance.

Fullman goes on to declare that "[i]n civil rights and conspiracy actions, . . . more than mere conclusory notice pleading is required." Id. "It is not enough," the court added, "to simply aver in the complaint that a conspiracy existed." Id. at 557. Thus a "complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy." Id.

9

Given these comments, <u>Fullman</u> appears to stand for the proposition that conspiracy allegations are subject to a heightened pleading standard.  See <u>Ross v. State of Alabama</u>, 15 F.Supp.2d 1173, 1191 (M.D. Ala. 1998) (DeMent, J.) (citing <u>Fullman</u> in asserting that "a more stringent pleading standard is required to state a claim under § 1983); <u>Malone v. Chambers County Board of Commrs.</u>, 875 F.Supp. 773, 790 (M.D. Ala. 1994) (Albritton, J.) (likewise stating that <u>Fullman</u> imposes a "'heightened pleading' standard" with respect to § 1983 complaints).  The United States Supreme Court has since rejected that proposition, holding that courts have no authority to create exceptions to the "simplified pleading standard" generally applicable under the Federal Rules of Civil Procedure.  <u>Swierkiewicz</u>, 534 U.S. at 513.

In identifying the appropriate pleading standard under Rule 12(b)(6), <u>Aquatherm</u> referred to <u>Lombard's</u>, which in turn referred to <u>Quality Foods de Centro America v. Latin American Agribusiness Dev. Corp.</u>, 711 F.2d 989 (11th Cir. 1983).  See <u>Aquatherm</u>, 145 F.3d at 1261; <u>Lombard's</u>, 735 F.2d at 975.  <u>Quality Foods</u> stated in pertinent part:

> [N]otice pleading is all that is required for a valid antitrust complaint. . . .  By notice pleading, we mean that the complaint need only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.  . . .
>
> Because of the liberal pleading requirements of the Federal Rules, rarely will a motion to dismiss for failure to state a claim be granted.  Indeed, such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  . . .  This is particularly true in an antitrust suit where the proof and details of the alleged conspiracy are largely in the hands of the alleged co-conspirators.  . . .
>
> This is not to say that liberal pleading requirements negate the need to draft an antitrust complaint in a careful and thoughtful fashion.  An antitrust complaint must comprehend a so-called prima facie case,

> . . . and enough data must be pleaded so that each element of the
> alleged antitrust violation can be properly identified. . . . Conclusory
> allegations that defendant violated the antitrust laws and plaintiff was
> injured thereby will not survive a motion to dismiss if not supported
> by facts constituting a legitimate claim for relief.      . . . However,
> the alleged facts need not be spelled out with exactitude . . . .

Quality Foods, 711 F.2d at 995 (quotation marks & citations omitted).

As mentioned, the Defendants argue that the Plaintiffs must include factual allegations as to "when and how" the price-fixing agreements were made, the "terms of such alleged agreements, and how those alleged agreements were supposedly implemented." Defendants' Brief at 12. The court believes that these are precisely the kinds of "details" which Quality Foods indicated would likely be known only by the "alleged co-conspirators," and hence should *not* be required in the complaint. Quality Foods, 711 F.2d at 995. See also Hospital Bldg. Co., 425 U.S. at 746 (". . . in antitrust cases, where the proof is largely in the hands of the alleged conspirators, . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (citation & quotation marks omitted)).

An argument could be made that while nominally adhering to a liberal pleading standard, Aquatherm and Lombard's actually applied a more rigorous standard in holding that the complaints under consideration failed to state an antitrust claim. See Aquatherm, 145 F.3d at 1261; Lombard's, 753 F.2d at 975. These cases could accordingly be construed as standing for the proposition that antitrust complaints are subject to a kind of *de facto* heightened pleading standard.

However, that rather cynical construction would put the Eleventh Circuit on a collision course with the United States Supreme Court. See Walker, 288 F.3d at 1008 (quoted supra p. 7).

It would also greatly complicate the task of lower courts in this circuit. It is difficult, after

11

all, to apply a heightened pleading standard which the Eleventh Circuit Court of Appeals has not

explicitly recognized, much less attempted to articulate in any coherent fashion. And given the

highly fact-sensitive nature of antitrust litigation, case-to-case consistency and predictability require

clearly stated overarching principles to which both the courts and the parties can refer in determining

what must be pled.

For these reasons, the court declines to infer from Aquatherm and Lombard's that antitrust

complaints are subject to a more exacting standard than, for example, "a complaint in an

employment discrimination lawsuit." Swierkiewicz, 534 U.S. at 508. Since the Eleventh Circuit

Court of Appeals has not explicitly ruled otherwise, the court assumes that in the antitrust context,

"the ordinary rules for assessing the sufficiency of a complaint apply." Id. at 511. The conspiracy

allegation in the SAC passes muster under these very lenient rules, as it makes reasonably clear what

the Defendants are accused of having done, thereby permitting the Defendants to formulate an

appropriate response. See generally Higgs, 286 F.3d at 439 (quoted supra p. 8).

> *The Cooperative-Buying Defense
> and Antitrust Injury*

The Defendants argue "that when Plan Sponsors use an individual PBM to administer their

prescription drug benefit plans, the economic effect of that action is similar to that of a cooperative

purchasing group." Defendants' Supplemental Submission (Doc. 91, case no. CV-03-HS-2695-NE),

at 5. This is significant, the Defendants explain, because "mere buying coops" receive "favorable

treatment under the Sherman Act." Id.

According to the Defendants, the "seminal" case on this point is Kartell v. Blue Shield of

Massachusetts, 749 F.2d 922 (1st Cir. 1984). Id. at 6. The plaintiffs in Kartell were physicians who

12

alleged that Blue Shield violated the Sherman Act by limiting the amount that they could charge for services provided to Blue Shield subscribers.  The court held that antitrust law did not forbid Blue Shield from fixing prices to be charged to others (*i.e.*, the subscribers).  Kartell, 749 F.2d at 927.

To reach this result, the First Circuit implicitly acknowledged the need to distinguish Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219 (1948).  See Kartell, 749 F.2d at 925.  In that case, northern California beet growers filed an action under the Sherman Act against a sugar refiner, claiming that it had conspired with two other refiners to fix the prices paid by the refiners for beets.  Mandeville, 334 U.S. at 221-22.  These "refiners controlled . . . the only practical market for beets grown in northern California."  Id. at 223.

The Ninth Circuit affirmed the district court's dismissal of the complaint for failure to state a cause of action.  Id. at 221.  The Court reversed, making the following pertinent observations:

> It is clear that the agreement [among the refiners] is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured . . . are sellers, not customers or consumers.  . . .
>
> The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these.  . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.

Id. at 235-36 (footnotes omitted).  See also id. at 235 n. 16 (favorably citing cases which "involved outlawed practices by persons who were both purchasers and sellers, and forbidden effects upon sellers as well as purchasers and consumers").

Kartell included Mandeville among 3 cases cited to illustrate the assertion that in situations "where courts have forbidden an 'organization' to buy a good or service[,] . . . the buyer was

typically a 'sham' organization seeking only to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up [the] price." Kartell, 749 F.2d at 925. The Defendants likewise argue that Mandeville is distinguishable because the price-fixing scheme was implemented by way of a "sham organization." Defendants' Reply (Doc. 31) at 7.

There is, however, no indication in Mandeville that the 3 refiners formed *any* kind of "entity," let alone one which was a "sham." Nor does Mandeville otherwise suggest that its analysis is limited in the fashion posited by Kartell or the Defendants.

The idea behind the "sham" distinction, the Defendants suggest, is that price-fixing is permissible if it serves "a legitimate business purpose in seeking to reduce costs and improve efficiencies." Defendants' Supplemental Submission at 7. But this simply begs the question as to when price-fixing is "legitimate." Nor does Kartell offer a coherent and satisfactory answer to that question.

The Defendants also rely on Austin v. Blue Cross & Blue Shield of Alabama, 903 F.2d 1385 (11th Cir. 1990). See Defendants' Supplemental Submission at 7. There the court stated that agreements between Blue Cross and various hospitals setting the price to be paid for health care rendered to Blue Cross subscribers was not an unreasonable restraint of trade. Austin, 903 F.2d at 1391.

However, Austin's benign view of the agreements was based on the absence of allegations that "Blue Cross conspired with the hospitals to engage in predatory pricing," or that the agreed-upon charges were below the hospitals' "average variable cost" or "total cost." Id. See generally Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n.8 (1986) ("[P]redatory pricing" is a term that "has been used chiefly in cases in which a single firm, having a dominant

14

share of the relevant market, cuts its prices" below "some appropriate measure of cost" as a means of forcing "competitors out of the market, or perhaps to deter potential entrants from coming in."). Allegations to that effect are made by the Plaintiffs in this case. See SAC at ¶¶ 46, 60, 63, 67, 68, 71, 76, 77, & 80.

While Austin is not on point, it does offers some guidance in suggesting that the distinction between "legitimate" buying arrangements and those that run afoul of the Sherman Act turns largely on the concept of "antitrust injury." See Austin, 903 F.2d at 1389-91. An antitrust injury is one which "result[s] from interference with the freedom to compete." Johnson v. University Health Servs., 161 F.3d 1334, 1338 (11ᵗʰ Cir. 1998). More specifically, it is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." DeLong Equip. Co. v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1198, amended, 997 F.2d 1340 (11ᵗʰ Cir. 1993) (citation & quotation marks omitted).

"[E]ven where the conduct complained of is illegal *per se*, a plaintiff must show that it is adversely affected by an *anti-competitive* aspect of the defendant's conduct." Id. (citation & quotation marks omitted; emphasis in original). In the absence of an antitrust injury, a plaintiff does not have standing to prosecute an action under § 1 of the Sherman Act. Eichorn v. AT &T Corp., 248 F.3d 131, 140 (3d Cir. 2001).

The SAC makes the following allegations regarding the nature of the harm caused by the Defendants:

> PBMs engage in numerous anti-competitive practices that have a detrimental effect on the competition for the dispensing and sale of prescription drugs reimbursed by insurance and generally result in increased prescription drug costs to both consumers and pharmacies and lower reimbursement rates to the pharmacies. These practices

15

. . . include . . . :

a.  Fixing and artificially depressing the prices to be paid to pharmacies for prescription drugs.

b.  Accepting "kickbacks" such as rebates, discounts, and other undisclosed incentives from drug manufacturers in return for placing the manufacturer's drugs on the PBMs' formulary and "pushing" these drugs on physicians and pharmacists regardless of whether the drug is the least expensive and most therapeutically effective drug available and using these undisclosed kickbacks to set anticompetitive prices for drugs filled through their in-house mail order pharmacies.

c.  Conspiring to and using their oligopolistic market power to force unconscionable reimbursement rates on "member pharmacies" with the specific intent to manipulate prices.  These reimbursement rates are far below the rates that would apply in a true competitive market and are generally below any measure of Independent Pharmacist's actual costs including their variable, marginal, and/or actual costs.  Additionally, the Defendants . . . unilaterally change reimbursement rates without negotiating with the member pharmacies and force these new rates upon them.

d.  Acting as a conduit for the [plan sponsors] . . . to engage in horizontal restraint of trade by removing the need and existence for any market whereby they must compete in order to secure the services of pharmacist[s] to service their insured.  The removal of this market and conferring of the aggregate power to negotiate these services upon Defendants and other PBMs amounts to horizontal price fixing as it allows for the stabilization and repression of the fees pharmacists would be able to charge in a free and open market.

e.  Diverting health plan members to mail order pharmacies, which are owned by Defendants and other PBMs, by prohibiting retail pharmacies from providing more than a 30-day supply of drugs, while allowing their own mail order pharmacies to provide 90-day supplies, through direct prohibitions on certain network pharmacies[,] preventing them from dispensing refill and follow-up prescriptions, and by

16

> undercutting the co-pay the network pharmacy is required to charge for each 30-day refill.
>
> f. Removing the physician and pharmacist from their vital role in the health care equation. PBMs "push" their formulary drugs on health plan members, bypassing the physician and the pharmacist, regardless of whether the formulary drug is the cheapest or most therapeutic drug in that class.
>
> g. Requiring pharmacists to contact the prescribing physician and patient, if a non-formulary drug was prescribed, and encourage a change to a formulary drug; and to provide the prescribing physician with a list of alternative formulary drugs.
>
> h. Requiring member pharmacies to use and pay for common software systems to process claims that are designed to maintain the detrimental pricing schemes.
>
> i. Imposing unreasonable and unnecessary additional costs on member pharmacies, including charging them a fee for each claim processed and a fee when the pharmacy seeks information from a PBM.
>
> j. Attempting to extend their oligopoly power in many directions[,] including the diversion of more profitable refill prescription business to their in-house mail order pharmacies and wholesale markets.

SAC at ¶ 5. <u>See also</u>, <u>e.g.</u>, <u>id</u>. at ¶ 4 ("PBMs now maximize their revenue through . . . methods resulting in egregious injuries to Plaintiff Independent Pharmacies and end consumers."); <u>id</u>. at ¶ 62 ("[T]he Defendants' practices harm competition in the marketplace and create antitrust injury.").

The Defendants characterize these allegations as "conclusory," and argue that the SAC is "defective as a matter of law" because the Plaintiffs "have not pled a single fact to explain how consumers or the 'marketplace' are injured as a result of [their] . . . allegedly anticompetitive conduct." Defendants' Brief at 6. Restating this argument in terms relevant to Rule 12(b)(6), the Defendants apparently take the position that the complaint does not reasonably support the inference that antitrust injury has occurred.

The Court disagrees.  A premise underlying the Defendants' argument is that there can be no antitrust injury if consumers are not adversely affected by their alleged price-fixing.  See id.  That premise may not be unanimously accepted.  See Telecor Comms. v. Southwestern Bell Tel. Co., 305 F.3d 1124, 1134 (10th Cir. 2002) (Mandeville "strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users. . . . Tenth Circuit case law also appears to reject the notion that a monopsony plaintiff must prove end-user impact."); see generally Black's Law Dictionary (8th ed.) (The term "monopsony" is used to describe a "situation in which one buyer controls the market.").

The issue is moot here, however, as the SAC suggests at least one scenario which would satisfy the consumer-injury requirement, and which is not implausible: By conspiring to hold down prices paid to independent pharmacies (among other alleged actions), PBMs will bankrupt those pharmacies, thereby capturing a larger segment of the insurance-paid prescription market for the PBMs' own prescription-dispensing business, and allowing the PBMs to charge higher prices for that service.  See SAC at ¶ 76 (Each of the Defendants' "practices harms consumers . . . by eliminating independent pharmacists nationwide."); id. at ¶ 33 (". . . Defendants' anticompetitive conduct is done with the purpose and specific intent to expand . . . their stranglehold on the market of insurance reimbursed prescription drug sales."); id. at ¶ 63 (The Defendants' "practices will ultimately drive independent pharmacists out of business," which will "harm competition in the marketplace and create antitrust injury."); see generally Levine v. Central Florida Medical Affiliates, 72 F.3d 1538, 1551 (11th Cir. 1996) (". . . the plaintiff may either prove that the defendants' behavior had an actual detrimental effect on competition, or that the behavior had the potential for genuine adverse effects on competition." (quotation marks omitted)).

18

The Defendants ridicule this theory on several grounds. They argue that the facts in this case don't fit the mold of a "true" claim of "predatory pricing" because there is no contention that the Defendants are selling a product or service at below cost. Defendants' Brief at 9. This case is atypical, the Defendants explain, because the allegation is that they have conspired to create an opportunity to charge supra-competitive prices by *paying* for a service at below the Plaintiffs' cost. Id.

One problem with the Defendants' position on this point is that it runs counter to a case upon which they themselves rely: As indicated earlier, Austin implicitly accepts the proposition that prices fixed by the purchaser *can* be predatory. See Austin, 903 F.2d at 1391 ("[T]here is no claim that Blue Cross conspired with the hospitals to engage in predatory pricing.").

The more fundamental problem is that the Defendants do not explain why their purchaser/seller distinction matters. The potential effect of the Defendants' alleged scheme on retail-level competition is in essence the same as is hypothesized in cases involving predatorily established pricing by sellers. Thus the antitrust injury is likewise the same. See Mandeville, 334 U.S. at 235-42; Todd v. Exxon Corp., 275 F.3d 191, 201 (2d Cir. 2001) (". . . a horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers."). And the Defendants' alleged scheme is actually more plausible, as it does not entail the risk associated with predatory pricing. Compare Matsushita, 475 U.S. at 589 ("Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, '[t]he predator must make a substantial investment with no assurance that it will pay off.'" (citation omitted; emphasis in original)).

Alluding to this lack of risk, the Defendants point out that they are not alleged to be "acting

19

against their short-run economic interests" by negotiating for lower prices. Defendants' Brief at 9-10. A credible allegation to this effect would tend to support a finding of conspiracy. See City of Tuscaloosa, 158 F.3d at 572 (quoted supra p. 5). But it is not a prerequisite to such a finding. Cf. In re Brand Name Prescription Drugs Antitrust Litigation, 186 F.3d 781, 787 (7th Cir. 1999) (While the plaintiffs were required "to present economic evidence that would show that the hypothesis of collusive action was more plausible than that of individual action[,] . . . [t]hey did not . . . have to exclude all possibility that the manufacturers' price discrimination was unilateral rather than collusive."). Nor is this allegation relevant to the question of antitrust injury.

The Defendants also observe that "the SAC makes no allegation regarding" their "ability" to raise prices after independent pharmacies are "driven . . . out of the market." Defendants' Brief at 10. This allegation, however, is implicit in the Plaintiffs' contention that the Defendants' "practices harm consumers . . . by eliminating independent pharmacists nationwide," SAC at ¶ 76, and are designed to "expand . . . their stranglehold on the market of insurance reimbursed prescription drug sales." Id. at ¶ 33. See also id. at ¶ 5 (alleging that the Defendants are "[a]ttempting to extend their oligopoly power" to the "refill prescription business"[3]). That is sufficient under Rule 12(b)(6). See generally 5 Wright & Miller Federal Practice and Procedure: Civil 3d § 1216 (". . . the complaint must contain either direct allegations on every material point . . . , or the pleading must contain allegations from which an inference fairly may be drawn by the district court that evidence on the these material points will be available and introduced at trial."); compare Phillips v. Grendahl, 312 F.3d 357, 365 (8th Cir. 2002) ("Although the complaint does not

_____

[3]An "oligopoly" is the "[c]ontrol or domination of a market by a few large sellers." Black's Law Dictionary (8th ed.). By definition, it results in "high prices." Id.

literally plead that defendants lacked a permissible purpose . . . , for purposes of notice pleading, lack of permissible purpose is implicit in the allegation that they did have an impermissible purpose."); Quality Foods, 711 F.2d at 996-97 (inferring that various key allegations were made in an antitrust complaint on the basis of other allegations therein).

The Defendants cite Spanish Broadcasting Sys. of Florida v. Clear Channel Comms., 376 F.3d 1065 (11th Cir. 2004), in which the court affirmed dismissal under Rule 12(b)(6) of an antitrust complaint that "offered only conclusory allegations of harm to competition." Id. at 1079. See Defendants' Reply at 2.

Spanish Broadcasting presents this court with the same dilemma as the decisions in Aquatherm and Lombard's, discussed supra p.10 – namely, a holding which is difficult to reconcile with the lenient pleading standard that the court purports to apply. See Spanish Broadcasting, 376 F.3d at 1070-79. Nevertheless, for the reasons stated earlier, the court adheres to the position that antitrust complaints are to be measured against the Federal Rules' "simplified pleading standard." Swierkiewicz, 534 U.S. at 513. By this measurement, the SAC adequately alleges antitrust injury.

### Common Agent

The Plaintiffs allege that the sponsors of the drug-benefit plans use the Defendants as their "common agents" in a scheme to fix prices to be paid for the Plaintiffs' services. SAC at ¶¶ 5, 56-57. The Defendants argue that this allegation is deficient because no claim is made that the sponsors agreed among themselves to implement such a scheme. Defendants' Brief at 14.

To support their contention that an allegation to this effect is necessary, the Defendants cite United States v. Chandler, 376 F.3d 1303 (11th Cir. 2004), a criminal-conspiracy case. Stated in terms applicable to this case, however, Chandler simply stands for the proposition that a plan sponsor

21

must be aware that by using a PBM, it and the PBM's other plan sponsors would be able to compel

independent pharmacies to accept lower prices than the pharmacies could command through separate

negotiations with each of the sponsors.  See id. at 1317 (construing a decision of the United States

Supreme Court as holding that  "where the 'spokes' of a conspiracy *have no knowledge of* or

connection with any other, dealing independently with the hub conspirator, there is not a single

conspiracy," and adding that "[w]e too have noted '[t]he importance in a wheel type conspiracy of

such *knowledge by individual spokes of the existence of other spokes*" (citation omitted; emphasis

added)).

The SAC implies that plan sponsors share, and are aware that they share, a common strategy

– *i.e.*, the utilization of a PBM to combine purchasing power and drive down pharmacy costs.  In

paragraph 5 of the SAC, for example, the Plaintiffs allege:

> PBMs . . . act[ ] as a conduit for [plan sponsors] . . . to engage in
> horizontal restraint of trade by removing the need and existence for
> any market whereby they must compete in order to secure the services
> of pharmacist[s] to service their insured.  The removal of this market
> and conferring of the aggregate power to negotiate these services
> upon Defendants and other PBMs amounts to horizontal price fixing
> as it allows for the stabilization and repression of the fees pharmacists
> would be able to charge in a free and open market.

The SAC goes on to allege:

> . . . by collectively conferring their pharmacy purchase decisions upon
> Defendants and other PBMs, [plan sponsors]   . . .  effectively
> accomplished the same anti-competitive behavior which would have
> existed if they had themselves directly engaged in horizontal price
> fixing.  By using Defendants as common agents, the  . . . [plan
> sponsors] are able to present retail pharmacies with worse
> coordinated offers and bargaining positions . . . .

SAC at ¶ 56.  See also id. at ¶ 57 ("Defendants and [plan sponsors] . . . engage in price fixing . . . .").

22

Based on these allegations, the court rejects the Defendants' argument that the common-agent theory is legally insufficient. See Bellevue Drug Co. v. Advance PCS, No. 03-4731, 2004 WL 724490, at *5 (E.D. Pa. Mar. 2, 2004) (Robreno, J.) (The "complaint alleges . . . that each plan sponsor is fully aware that Advance PCS negotiates with . . . pharmacies on behalf of many other plan sponsors." If true, the plaintiffs' allegations "may give rise to the inference that Advance PCS acted with the acquiescence and understanding of the plan sponsors it represented and that each plan sponsor 'had an awareness of the general scope and purpose of the undertaking.'" (quoting United States v. Masonite Corp., 316 U.S. 265, 275 (1942)); see also Brady Enters. v. Medco Healths Solutions, No. 03-4730, 2004 WL 1737651, at *1 (E.D. Pa. Aug. 3, 2004) (Fullam, J.) (concurring with the decision in Bellevue).

The Defendants also argue that if a common-agent theory is "cognizable," it establishes a vertical restraint, and is therefore subject to the "rule of reason." Defendants' Brief at 15. See State Oil Co. v. Khan, 522 U.S. 3, 18 (1997) ("[T]here is insufficient economic justification for per se invalidation of vertical maximum price fixing."). The Plaintiffs' invocation of the theory fails, the argument continues, because nothing in the SAC "suggests . . . a rule of reason violation." Defendant's Brief at 15.

"[A] restraint is horizontal . . . because it is the product of a horizontal agreement." Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 731 n.4 (1988). Thus if plan sponsors have conspired to fix prices, a horizontal restraint is created even if PBMs are used to carry out the scheme. Cf. id. ("[A] facially vertical restraint imposed by a manufacturer only because it has been coerced by a 'horizontal carte[l]' agreement among his distributors is in reality a horizontal restraint.").

23

The Defendants' argument fails for another reason. The "*per se*" designation is reserved for those "types of restraints" which are "deemed unlawful" precisely because they "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit." State Oil, 522 U.S. at 10. Thus the Plaintiffs' allegation of a *per se* violation, see SAC at ¶¶ 67 & 76, logically implies a violation of the rule of reason. See State Oil, 522 U.S. at 10 ("*Per se* treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" (citation omitted)). For purposes of Rule 12(b)(6), then, the common-agent theory would be viable even if the Defendants were correct in asserting that it does not establish a *per se* violation.

### Pricing

The Plaintiffs allege that the fees paid to them by the various Defendants "are roughly the same and/or remarkably similar." SAC at ¶ 32. The Defendants argue that "these nebulous allegations of similar rates or prices do not support the inference that there was any conspiracy to fix such rates or prices." Defendants' Brief at 18.

Illicit price-fixing does not require a finding that the prices set are "uniform and inflexible." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222 (1940). As the Supreme Court explained,

> An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used. . . . [P]rice fixing includes more than the mere establishment of uniform prices . . . . [P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. . . . [Price-fixing] in its various

> manifestations is implicitly an artificial stimulus applied to (or at
> times a brake on) market prices, a force which distorts those prices,
> a factor which prevents the determination of those prices by free
> competition alone.

Id. at 222-23.

The SAC alleges that the Defendants have conspired to keep the prices paid to the Plaintiffs at below market-rate levels. See, e.g., SAC at ¶¶ 56, 67, & 76. Socony-Vacuum instructs that this allegation suffices for purposes of the Sherman Act.

The Defendants' alternative argument fails for the same reason. Citing the relevant contracts, copies of which have been submitted under seal, the Defendants claim that the fees actually paid by them to the Plaintiffs are "widely divergent." Defendants' Brief at 18. See generally Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999) (". . . a document central to the complaint that the defense appends to its motion to dismiss is . . . properly considered, provided that its contents are not in dispute."). This alleged discrepancy does not rule out the possibility that even the highest contract prices are artificially low – i.e., less than what the Defendants would be obliged to pay in the absence of a price-fixing conspiracy. See Socony-Vacuum, 310 U.S. at 223. Thus even if the contracts can properly be taken into account, the prices set forth therein do not establish grounds for dismissal under Rule 12(b)(6).

### III. CONCLUSION

The SAC provides the Defendants with fair notice as to the nature and basis of the claims made against them. Moreover, the SAC affords no sound basis for ruling out the possibility that the Plaintiffs will be able to establish facts which establish a right of recovery for violation of the Sherman Act. The Defendants' motion to dismiss will therefore be denied.

A separate order will be entered.

October 13, 2004.

_____

VIRGINIA EMERSON HOPKINS
UNITED STATES DISTRICT JUDGE